## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CONNECTICUT STATE POLICE UNION,

          Plaintiff,

v.

JAMES ROVELLA, Commissioner of
Department of Emergency Services & Public
Protection,

          Defendant.

3:20-cv-01147 (CSH)

**OCTOBER 13, 2020**

### RULING ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**HAIGHT, Senior District Judge**:

By this action, Plaintiff Connecticut State Police Union ("the CSPU") seeks to enjoin provisions of the recently enacted Connecticut Public Act No. 20-1 ("the Act").   The Defendant is the Connecticut State Commissioner charged with implementing the Act.

The Act's provisions in question require disclosure of state police disciplinary records pursuant to the Connecticut Freedom of Information Act ("FOIA").   Plaintiff alleges that the Act's mandated disclosure violates the Contracts Clause of the United States Constitution, to the extent that the Act overrides non-disclosure provisions contained in a Collective Bargaining Agreement entered into between Plaintiff and the State of Connecticut.

In an earlier Memorandum and Order [Doc. 15], familiarity with which is assumed, the Court

1

denied Plaintiff's motion for a temporary restraining order and scheduled a hearing on Plaintiff's motion for a preliminary injunction.  This Ruling decides that motion.

I

**Introduction**

This is a constitutional case.  Plaintiff alleges an Act of the Connecticut Legislature violates the Contracts Clause of the United States Constitution, which states that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts."   U.S. Const. Art. I § 10, cl. 1.  Defendant denies that the Act violates the Contracts Clause.

Plaintiff's theory is that the Act violates a Collective Bargaining Agreement between the CSPU and the State of Connecticut.  Accordingly, the contract in suit is a *governmental* contract, and falls within the Second Circuit's recent holding in *Sullivan v. Nassau County Interim Finance Authority*, 959 F.3d 54, 63 (2020): "The Contracts Clause, as applied to governmental contracts, incorporates two differing imperatives.  The first is that the government, like private parties, is bound by its contracts and may not use its governmental powers to impair these contracts materially.  The second is that the state may not contract away its power to govern in the public interest." *Id.* (citing *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367–68 (2d Cir. 2006).

The collision of these "two differing imperatives" has generated a substantial number of federal court decisions, the two most recent in the Second Circuit being *Sullivan* and *Buffalo Teachers*, which instruct this Court in the case at bar and are cited throughout this Ruling.  However, it is necessary to note procedural differences between those circuit cases and this one.  The Second Circuit heard *Sullivan* and *Buffalo Teachers* on appeals from cross-motions for summary judgment.  Federal Rule of Civil Procedure 56 governed those decisions.  The case at bar comes before this Court on Plaintiff's

motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a).

The Court's resolution of this motion accordingly is governed by appellate decisions which grant or deny preliminary injunctions. Those authorities are discussed in Part III, *infra*. Part II recites the factual background of the case.

II

## Factual Background

Plaintiff Connecticut State Police Union ("CSPU") represents Connecticut State Troopers, Sergeants, and Master Sergeants from the NP-1 bargaining unit (collectively "State Troopers") in connection with collective bargaining negotiations.[1] The CSPU's stated purpose is "to uphold the honor of the State Police profession and vigilantly protect, promote, advance and improve working conditions, legal rights, compensation and benefits of its 857 members."[2]

Defendant James Rovella (hereinafter sometimes "the Commissioner") is Commissioner of Department of Emergency Services & Public Protection (DESPP). In this role, he "serves as the administrative head and commanding officer of the State Police Division pursuant to Connecticut General Statutes § 29-1b."[3]

On July 1, 2018, the CSPU entered into the 2018–2022 Collective Bargaining Agreement with the State of Connecticut, effective until June 30, 2022.[4] The Agreement was ratified by the

---

[1] *See* Compl. ¶¶ 14–15; Doc. 4-1 ("CSPU's Br."), at 2.

[2] Compl. ¶ 13.

[3] *Id.* ¶ 10.

[4] CSPU's Br. at 3.

Connecticut General Assembly on May 31, 2019.[5] Article 9, Section 2 of the 2018–2022 Collective Bargaining Agreement provides, in relevant part, that State Troopers' personnel files and records relating to internal affairs investigations with a disposition of "Exonerated, Unfounded or Not Sustained" will not be subject to Connecticut Freedom of Information Act (FOIA). Specifically, the Collective Bargaining Agreement therein provides:

> (a) ... Internal affairs investigations with a disposition of exonerated unfounded or Not Sustained" will be excluded from the employee's personnel file ....
> ....
>
> (c) When an employee, after notification to him/her that a freedom of information request has been made concerning his/her file, objects to the release of that information on the basis of reasonable belief that the release would constitute an invasion of his/her privacy, the employee shall petition the Freedom of Information Commission for a stay on the release of said information, and the Department shall support the employee's petition and not release the information until the FOIA has made a final determination on the issue of whether said release would constitute an invasion of privacy. <u>An employee's OPF and internal affairs investigations with only a disposition of "Exonerated, Unfounded or Not Sustained" shall not be subject to the Connecticut Freedom of Information Act.</u>

(Emphasis added).

This language—that investigative records with a disposition of "Exonerated, Unfounded or Not Sustained" are exempt from FOIA's disclosure requirements—did not exist in the previously negotiated 2015–2018 Collective Bargaining Agreement.[6] Rather, it was a new addition to the 2018–2022 Collective Bargaining Agreement. It appears that this non-disclosure provision was adopted in response to concerns regarding an increase in false anonymous complaints filed against Troopers.[7]

---

[5] *Id*. at 4.

[6] *Id*. at 4–5.

[7] Doc. 17 ("CSPU's Reply"), at 4; Doc. 17-1 ("CSPU's App."), at 5.

4

Generally, under FOIA, "all records maintained or kept on file by any public agency" are "public records" that may be inspected or copied by any person. *See* Conn. Gen. Stat. § 1-210(a). However, the non-disclosure provision of the 2018–2022 Collective Bargaining Agreement was permissible under Section 5-278(e) of Connecticut General Statutes, which provided, in relevant part, that "[w]here there is a conflict between any agreement ... approved in accordance with the provisions of sections 5-270 to 5-280[8] ... and any general statute or special act ... the terms of such agreement ... shall prevail."[9]

On July 17, 2020, Governor Ned Lamont called a Special Session of the General Assembly to "enact legislation to promote greater transparency and accountability for law enforcement."[10]  In his Proclamation, Governor Lamont explained: "[A] Minneapolis police officer's killing of George Floyd has revealed once again the injustice and cruelty that Black people and other people of color suffer at the hands of law enforcement, and has thereby awoken the public's demand for reforms to our law enforcement agencies and progress toward a just and equitable society.  [T]hese recent events and the justifiable public anger over them once more confront us with what Dr. Martin Luther King, Jr. called 'the fierce urgency of now' ... [T]he General Assembly passed, and in more recent instances I have signed, legislation promoting police accountability and transparency as well as broader reforms to our

---

[8] Sections 5-270 to 5-280 of Connecticut General Statutes regulate collective bargaining agreements and awards for state employees.

[9] As explained infra, this provision is now amended by Sections 8 and 9 of the Act so as to allow disclosure of disciplinary records under FOIA.

[10] Governor's July 17, 2020 Proclamation, at 2–3, *available at* https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200717-Call-of-July-2020-Special-Session.pdf (last visited on August 27, 2020).

criminal justice system ... but much more work remains to be done."[11]

On July 31, 2020, the Connecticut General Assembly passed and Governor Lamont signed into law an Act Concerning Police Accountability, Public Act No. 20-1 ("the Act").[12]  Sections 8 and 9 of the Act require disclosure of disciplinary records under FOIA regardless of the terms of any previously negotiated collective bargaining agreements.  Section 8 expressly repeals Section 5-278(e) of the Connecticut General Statutes and substitutes new language in its place:

> Subsection (e) of section 5-278 of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):
>
> > (e) [Where] (1) *Except as provided in subdivision (2) of this subsection*, where there is a conflict between any agreement ... approved in accordance with the provisions of sections 5-270 to 5-280 ... and any general statute or special act ... the terms of such agreement or arbitration award shall prevail
> >
> > (2) For any agreement ... approved before, on or after the effective date of this section ... where any provision in such agreement ... pertaining to the disclosure of disciplinary matters or alleged misconduct would prevent the disclosure of documents required to be disclosed under the provisions of the Freedom of Information Act ... *the provisions of the Freedom of Information Act shall prevail.*

(Emphasis added).

Similarly, Section 9 of the Act provides in relevant parts:

> No collective bargaining agreement ... entered into before, on or after the effective date of this section, by the state and any collective bargaining unit of the Division of State Police within the Department of Emergency Services and Public Protection may prohibit the disclosure of any disciplinary action based on a violate of the code of ethics contained in the personnel file of a sworn member of said division.

Thus, Sections 8 and 9 provide that FOIA's provisions will prevail over any collective bargaining

---

[11] *Id.*

[12] Compl. ¶ 5.

agreement that seeks to shield disciplinary records or allegations of misconduct from disclosure.

The CSPU contends that these provisions violate the Contracts Clause of the United States Constitution to the extent that they nullify the CSPU's rights under Article 9 of the 2018–2022 Collective Bargaining Agreement, which protects investigative records with a disposition of "Exonerated, Unfounded or Not Sustained" from disclosure under FOIA.

The CSPU states that DESPP has rejected the CSPU's request "to refrain from releasing any information that would be in contravention of the 2018–2022 Collective Bargaining Agreement's requirements."[13]  Indeed, Training Bulletin issued by DESPP on July 31, 2020 advises State Troopers that the Act "nullifies collective bargaining language and arbitration awards previously negotiated, regarding the disclosure of disciplinary action," and "provides for the public disclosure of disciplinary matters ... under the Freedom of Information Act" effective immediately.[14]  CPSU has also learned that there are pending FOIA requests for personnel files and internal investigative records that violate Article 9 of the 2018-2022 Collective Bargaining Agreement.[15]

In this action, the CSPU seeks to enjoin Sections 8 and 9 of the Act to the extent that they interfere with the State's obligations under Article 9, Section 2(c) of the 2018–2022 Collective Bargaining Agreement, and asks the Court to order the Commissioner to:

(1) comply with the 2018–2022 Collective Bargaining Agreement's requirements ... and

(2) treat an employee's [official personnel file] and internal affairs investigations with only a disposition of "Exonerated, Unfounded or Not Sustained" as not subject to the Connecticut Freedom of Information Act pursuant to the 2018–2022 Collective Bargaining Agreement."

---

[13] CSPU's Br. at 16.

[14] Doc. 1-3 ("Compl. Exh. B"), at 2.

[15] Compl. ¶ 32.

CSPU's Br. at 16–17.

The CSPU's initial filing prayed for a temporary restraining order and an expedited hearing on its motion for a preliminary injunction.

In a Memorandum and Order that did not consider the merits, the Court denied the CSPU's motion for a temporary restraining order and scheduled a hearing on its motion for a preliminary injunction. The Court directed expedited hearing on that motion, and then heard oral argument.

The CSPU is represented by private counsel. The office of the Connecticut Attorney General represents the Commissioner. Counsels' briefs were thorough and helpful, and their oral submissions were pointed and trenchant.

The Court now resolves the CPSU's motion for a preliminary injunction.

III

**Standard of Review**

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks omitted). Ordinarily, to obtain a preliminary injunction, a movant must show irreparable harm and meet *either* of two standards: "(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), *rev'd on other grounds*, — U.S. —, 140 S.Ct. 2019 (2020); *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019).

However, in a case where the movant seeks to enjoin "government action" taken pursuant to

8

a statutory or regulatory scheme, the injunction should be granted only if the movant meets "the more rigorous" likelihood-of-success standard. *See Deutsche Bank*, 943 F.3d at 637, 639 (collecting cases).[16] As the Second Circuit explained, this "exception" to the use of the serious-questions standard "reflects the idea that governmental policies implemented through legislation ... are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* at 638 (internal citation and quotation marks omitted). Rather, the likelihood-of-success standard is appropriate in a case "where the full play of the democratic process involving both the legislative and executive branches has produced a policy in the name of the public interest embodied in a statute and implementing regulations." *Id.*

In addition to demonstrating a likelihood of success on the merits, the movant must show that enjoining government action would serve the public interest and that the balance of equities tips in the movant's favor. *See Yang*, 960 F.3d at 127 (citing, *inter alia*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Deutsche Bank AG*, 943 F.3d at 641 (considering whether an injunction was in the public interest and whether the balance of equities tipped in the plaintiff's favor where the plaintiff sought to enjoin government action).

Because the CSPU seeks to enjoin portions of Public Act 20-1, which was enacted through the democratic process to further the state's police accountability objectives, the more rigorous likelihood-of-success standard governs the CSPU's motion for a preliminary injunction. *See Deutsche Bank AG*,

---

[16] *See also Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) ("to obtain a preliminary injunction against governmental action taken pursuant to a statute," the movant must demonstrate, among other things, "a likelihood of success on the merits"); *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 181 (2d Cir. 2020) ("because [plaintiff] seeks a preliminary injunction to stay government action taken in the public interest pursuant to a statutory (and regulatory) scheme, it must establish both a likelihood of success on the merits and irreparable harm in the absence of an injunction"); *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 52 (2d Cir. 1998) (the moving party who "seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme" must meet "the more rigorous likelihood of success standard").

943 F.3d at 638; *Yang*, 960 F.3d at 127; *New Hope Family Servs.*, 966 F.3d at 181; *Sal Tinnerello & Sons*, 141 F.3d at 52.

Thus, to obtain a preliminary injunction in this case, the CSPU must demonstrate 1) irreparable harm absent the injunction; 2) a likelihood of success on the merits; 3) public interest weighing in favor of granting the injunction; and 4) a balance of equities tipping in the CSPU's favor.

IV

**Irreparable Harm**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). Irreparable harm exists where, absent an injunction, a movant will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* A plaintiff suffers irreparable harm when its injury cannot be adequately compensated by a monetary award. *See Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113–14 (2d Cir. 2003).

The CSPU alleges that, absent an injunction, it will suffer irreparable harm to its contractual rights under the 2018–2022 Collective Bargaining Agreement in violation of the Contracts Clause.[17] The CSPU contends that this harm is actual and imminent, rather than speculative, because the DESPP has rejected the CSPU's request "to refrain from releasing any information that would be in contravention of the 2018–2022 Collective Bargaining Agreement's requirements."[18] Indeed, Training

---

[17] CSPU's Br. at 15–16.

[18] *Id.* at 16.

Bulletin issued by DESPP on July 31, 2020 advises State Troopers that the Act "nullifies collective bargaining language and arbitration awards previously negotiated, regarding the disclosure of disciplinary action," and "provides for the public disclosure of disciplinary matters … under the Freedom of Information Act" effective immediately.[19]  The CSPU states that "there are pending FOIA requests for personnel files and the results of internal affairs investigations" made under the Act.[20]  "Once this information is released," the CSPU argues, "[t]he damage will be irreparably done."[21]

It is generally held that an alleged deprivation of constitutional rights—including rights violated under the Contracts Clause[22]—raises "a presumption of irreparable harm."  *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012); *see also Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (citing 11 C. Wright & A. Miller, Federal Practice and Procedure, § 2948, at 440 (1973)).

However, a mere "assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm."  *Donohue*, 886 F. Supp. 2d at 150.  Rather, "in order to show irreparable injury, plaintiff must show a likelihood of success on the merits" of its constitutional claim.  *Turley v.*

---

[19] *See* Compl. Exh. B at 2.

[20] CSPU's Br. at 16.

[21] *Id.*

[22] *Donohue*, 886 F. Supp. 2d at 150 (a deprivation of constitutional rights "is not just limited to violations of free speech or due process, but may include violations of the Contract Clause as well").

*Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000) (stating that, where "the violation of a constitutional right is the irreparable harm asserted ... the two prongs of the preliminary injunction threshold merge into one"); *see Donohue*, 886 F. Supp. 2d at 150 (stating that, to warrant a finding of irreparable harm, the constitutional deprivation must be "convincingly shown"); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 742 (D. Conn. 2018) ("*Having established* that a constitutional claim has occurred, Plaintiffs are entitled to a presumption that an irreparable injury has occurred.") (emphasis added).

It follows that the next step in the Court's analysis is to determine whether the CSPU is likely to succeed on the merits of its Contracts Clause claim. If the CSPU is likely to succeed on the merits, a presumption of irreparable harm is warranted, since the CSPU's alleged injury is both imminent and actual, and can only be remedied by requiring Defendant to comply with notice and non-disclosure requirements of Section 9 of the 2018–2022 Collective Bargaining Agreement.[23]

---

[23] The Commissioner contends that the CSPU has not demonstrated irreparable harm because the State's decision to make police disciplinary records subject to FOIA does not necessarily mean that all such records will be disclosed. *See* Doc. 14 ("D.'s Opp. Br."), at 21. Specifically, the Commissioner references Section 1-210(b)(2) of the statute, which provides: "Nothing in [FOIA] shall be construed to require disclosure of ... Personnel or ... similar files the disclosure of which would constitute an invasion of personal privacy." *Id.*; *see also Perkins v. Freedom of Info. Comm'n*, 228 Conn. 158, 175 (1993) (explaining that "the invasion of personal privacy exception" precludes disclosure under FOIA "when the information sought by a request does not pertain to legitimate matters of public concern and is highly offensive to a reasonable person"). However, this argument—that the CSPU has failed to show irreparable harm to State Troopers' personal privacy interests—misconstrues the CSPU's position. The CSPU does not contend that State Troopers will suffer irreparable harm to their privacy interests as a result of the Act's disciplinary record disclosure provisions. Rather, the CSPU's claim of irreparable harm is based on a deprivation of its constitutional rights under the Contracts Clause and the state's impairment of its contractual obligations. *See Donohue*, 886 F. Supp. 2d at 150 (a violation of the Contracts Clause may constitute irreparable harm). Accordingly, the existence of FOIA's personal privacy exemption does not control the irreparable harm determination. Nevertheless, as discussed further in this Opinion, this exemption and FOIA's regulatory framework are relevant to the Court's analysis of the merits of the CSPU's Contracts Clause claim.

V

**Questions Presented by the CSPU's Contract Clause Claim**

The Contracts Clause of the United States Constitution prohibits states from passing "any ... Law impairing the Obligation of Contracts."  U.S. Const. Art. I § 10, cl. 1.  "Although facially absolute," the Contracts Clause "does not trump the police power of a state to protect the general welfare of its citizens." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006) (stating that the state's police power "is paramount to any rights under contracts between individuals") (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240–41 (1978)).[24]

Accordingly, "state laws that impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause claim." *Buffalo Teachers*, 464 F.3d at 368.  The Second Circuit went on to say in *Buffalo Teachers* that to determine if a state law violates the Contracts Clause, "we pose three questions to be answered in succession: (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary." *Id.*  To those questions, the Second Circuit added in *Buffalo Teachers*: "We also consider the level of deference to give to a legislature's determination that a law was reasonable and necessary." *Id.*

_____

[24] *See also United States Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977) ("Although the Contract Clause appears literally to proscribe any impairment, this Court [has] observed that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.") (quotation marks omitted); *W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 433 (1934) ("[L]iteralism in the construction of the contract clause ... would make it destructive of the public interest by depriving the State of its prerogative of self-protection."); *Sal Tinnerello & Sons*, 141 F.3d at 52 (noting the "need to harmonize the command of the Clause with a state's police power to protect its citizens").

I consider these questions in order.

VI

**Substantial Impairment**

A law substantially impairs a contractual relationship where it disrupts the party's "reasonable expectations under the contract." *Buffalo Teachers*, 464 F.3d at 368. "And the reasonableness of expectations depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry." *Sullivan*, 959 F.3d at 64. *See also Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997) ("Impairment is greatest where the challenged government legislation was wholly unexpected. When an industry is heavily regulated, regulation of contracts may be foreseeable."). These cases reveal that, in the particularized language of the law, a lawyer can say a contract is not *impaired* by words a professor of plain English would say *changed* the contract. If in the circumstances the possibility of the change could be reasonably expected, that change, should it come, does not impair the contract.

In this case, Sections 8 and 9 of the Act provide that no previously negotiated collective bargaining agreement may prohibit the disclosure of disciplinary matters and allegations of misconduct under FOIA. Thus, by their express terms, these provisions change the CSPU's rights under Article 9 of the 2018–2022 Collective Bargaining Agreement, which provides that personnel and investigative records with a disposition of "unfounded" or "Not Sustained" are not subject to FOIA.

The CSPU contends that this change is a substantial impairment of contract because the CSPU had a reasonable expectation that "the terms of its collective bargaining agreement," which was ratified

14

by the state legislature, "would be honored by the State."[25]   In Connecticut, collective bargaining agreements containing provisions that are in conflict with any state statute—such as FOIA—must be approved by the General Assembly.  *See* Conn. Gen. Stat. § 5-278(b).[26]  Importantly, at the time when the CSPU entered into the 2018–2022 Bargaining Agreement—and before Section 8 of the Act amended Section 5-278(e) of Connecticut General Statutes—collective bargaining agreements could contain provisions exempting disciplinary records from FOIA requirements.[27]  Furthermore, the CSPU expected that the terms of the 2018–2022 Bargaining Agreement would be in force until at least June 30, 2022, the date of the agreements' expiration.  For these reasons, the CSPU argues that it had a reasonable expectation that the State would comply with the terms of the 2018-2022 Bargaining Agreement, and that the CSPU could not foresee a possible future impairment.

The Commissioner professes a contrary view.  He contends that the CSPU could have foreseen that State Troopers' disciplinary records might become subject to FOIA, because such records were subject to FOIA in the past.[28]  The Commissioner contends that, because disciplinary records have been

---

[25] CSPU's Reply at 2.

[26] "The agreement, together with a request for funds ... *and for approval of any provisions of the agreement which are in conflict with any statute or any regulation of any state agency* ... shall be filed by the bargaining representative of the employer with the clerks of the House of Representatives and the Senate ... The General Assembly may approve any such agreement as a whole ... or may reject such agreement as a whole ...") (emphasis added); *see also* L. Hansen, "Questions on Public Employee Supersedence Laws," Office of Legislative Research Report (Dec. 13, 2019) ("An agreement's superseding provisions must also be approved under the procedures established in the state employee collective bargaining law.").

[27] As noted earlier, prior to being amended by Section 8 of the Act, Section 5-278(e) of Connecticut General Statutes provided:  "Where there is a conflict between any [collective bargaining] agreement ... and any general statute or special act ... the terms of such agreement ... shall prevail."

[28] D.'s Br. at 9–11.

heavily regulated by the State since the enactment of FOIA, the CSPU did not have a reasonable expectation that the State would not impair its non-disclosure obligations—rather, it should have anticipated future regulation.[29]

FOIA "expresses a strong legislative policy in favor of the open conduct of government and free public access to government records." *Wilson v. Freedom of Info. Comm'n*, 181 Conn. 324, 328 (1980); *see also Rose v. Freedom of Info. Comm'n*, 221 Conn. 217, 233 (1992) (stating that, under FOIA, "the general rule is disclosure and ... exceptions will be narrowly construed"). There is no dispute that State Troopers' disciplinary records constitute public records that are generally subject to disclosure under FOIA. *See* Conn. Gen. Stat. § 1-210 (a) ("all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to (1) inspect ... , (2) copy ... or (3) receive a copy of such records ...").

The CSPU does not contest that such records were subject to FOIA prior to the adoption of Section 9 of the 2018–2022 Collective Bargaining Agreement, which, for the first time, stipulated that investigative records with a disposition of "unfounded" or "Not Sustained" would be exempt from FOIA. The CSPU concedes that this non-disclosure provision was not part of the 2015–2018 Collective Bargaining Agreement, and that State Troopers' disciplinary records were subject to FOIA prior to 2018.[30] Nor does the CSPU dispute that Sections 8 and 9 of the Act perfectly align with FOIA's long-standing policy of transparency, which favors "the open conduct of government and free

---

[29] *Id.*

[30] *See* CSPU's Br. at 5.

public access to government records." *See Perkins v. Freedom of Info. Comm'n*, 228 Conn. 158, 166 (1993); *Wilson*, 181 Conn. at 328.

The Commissioner argues that, because of this legislative policy and the fact that State Troopers' disciplinary records were subject to FOIA prior to 2018, the CSPU should have anticipated that such records would be subject to disclosure again.  The Commissioner argues that this case is comparable to *Alliance of Automobile Manufacturers*, *Inc. v. Currey*, 984 F. Supp. 2d 32, 55 (D. Conn. 2013), *aff'd*, 610 Fed. Appx. 10 (2d Cir. 2015), where the district court held that, because Connecticut regulated warranty reimbursement rates "for decades," and the new regulation "cover[ed] the same topic and share[d] the same overt legislative intent" as past regulations, the Plaintiffs Manufacturers had no reasonable expectation "to be free of this sort of regulation" in their contracts with Dealers, and no substantial impairment existed.

*Alliance of Automobile Manufacturers* is distinguishable on its facts.  In that case, the state regulation impaired *private* contracts between the manufacturers and the dealers, rather than a *public* contract to which the state itself was a party.  *Id.* at 54; *see also Sanitation & Recycling Indus.*, 107 F.3d at 994 (finding no substantial impairment to the carters' private contracts relating to garbage collection and disposal because (1) "carters have been for decades subject to the City's regulations," and (2) "[the] City has broad (though not unlimited) power to enact a law ... to achieve ... legitimate ends without worrying that in so doing *private* contracts may be impaired or even destroyed.") (emphasis added).

Such cases may be contrasted with the case at bar, where the state is a party to the contract in suit.  There is a distinct appeal to the CSPU's protestation of a reasonable expectation that the State of Connecticut would comply with its contractual obligations.  The CSPU may take some comfort from

17

*Sullivan* and *Buffalo Teachers*—each Second Circuit opinion held that the state-imposed wage freezes substantially impaired government employees' rights under public labor contracts. *See Buffalo Teachers*, 464 F.3d at 368 (finding that a wage freeze imposed by the state constituted a substantial impairment because it disrupted the reasonable expectations of Buffalo's municipal school district workers under their labor contracts with the City); *Sullivan*, 959 F.3d at 64–65 (finding that a wage freeze imposed by the state constituted a substantial impairment because it disrupted the reasonable expectations of County's employees under their collective bargaining agreements with the County).

*Sullivan* and *Buffalo Teachers* do not directly address the question presented by the case at bar. Both Second Circuit cases expressly derived their findings of substantial impairment from the fact that the wage provisions in question formed the basis of employees' bargain with the government.[31] It is unclear whether the same reasoning should apply to the records disclosure provision at issue in this case. *See Sullivan*, 959 F.3d at 64 ("wage levels are a crucial component of labor contracts and are likely to create reasonable expectations"); *Buffalo Teachers*, 464 F.3d at 368 ("The promise to pay a sum certain constitutes not only the primary inducement for employees to enter into a labor contract, but also the central provision upon which it can be said they reasonably rely ... we may safely state the wage freeze so disrupts the reasonable expectations of Buffalo's municipal school district workers that the freeze substantially impairs the workers' contracts with the City.").

The precise question posed by this case appears to be an open one under the law of this circuit. For the purpose of the present motion by the CSPU for a preliminary injunction, I will assume without

---

[31] Ultimately, neither *Sullivan*, nor *Buffalo Teachers* found a violation of the Contracts Clause because the wage freezes served a legitimate public purpose and were reasonable and necessary under the circumstances. *Sullivan*, 959 F.3d at 69; *Buffalo Teachers*, 464 F.3d at 373.

deciding that the Act's disclosure provisions disrupted the CSPU's reasonable expectations under the 2018–2022 Collective Bargaining Agreement and thus constituted substantial impairment of that contract. That conclusion, standing alone, does not entitle the CSPU to succeed on the merits of its Contract Clause claim. The CSPU must also establish that Sections 8 and 9 of the Act did not have a legitimate public purpose, or if such purpose existed, these particular provisions were not reasonable or necessary to achieve them.

VII

## Legitimate Public Purpose

"Even if a state law substantially impairs a contract, it will not be deemed unconstitutional so long as it is justified by a significant and legitimate public purpose." *CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 267 (2d Cir. 2009). "A legitimate public purpose is one aimed at remedying an important general social or economic problem, rather than providing a benefit to special interests." *Buffalo Teachers*, 464 F.3d at 368 (internal quotation marks omitted).

The CSPU disputes that Sections 8 and 9 of the Act serve a significant and legitimate public purpose—but those arguments are without merit.[32] As evident from the public record, the Act was adopted "to promote greater transparency and accountability for law enforcement" in response to "a Minneapolis police officer's killing of George Floyd on May 25, 2020, which led to mass and sustained

---

[32] The CSPU is correct that it is Defendant's burden to show that the challenged law has a legitimate public purpose. *See Buffalo Teachers*, 464 F.3d at 368–69 ("When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law."). As discussed below, however, Defendant has met this burden. The CSPU's statement that "defendant does not identify anything in the legislative record of Public Act 20-1 that would provide any explanation as to what public policy or social or economic problem Sections 8 and 9 sought to remedy" is simply inaccurate. *See* CSPU's Reply at 3.

protests across the country and awoke the public's demand for reforms to our law enforcement agencies and progress toward a just and equitable society."[33]  The Commissioner states that, by subjecting police disciplinary records to FOIA, Sections 8 and 9 of the Act ensure greater police accountability and benefit the public, "who can now access these important records and see for themselves how state government is operating in this area."[34]

The Act's disclosure provisions thus also align with FOIA's "strong legislative policy in favor of the open conduct of government and free public access to government records." *Wilson*, 181 Conn. at 328; *see also City of Stamford*, 241 Conn. at 313 ("The sponsors of [FOIA] understood the legislation to express the people's sovereignty over the agencies which serve them ... and this court consistently has interpreted that expression to require diligent protection of the public's right of access to agency proceedings."); *Rose*, 221 Conn. at 233  ("the general rule [under FOIA] is disclosure and ... exceptions will be narrowly construed").

For these reasons, the Commissioner has established on the present record that Sections 8 and 9 of the Act serve a legitimate public purpose.

## VIII

**Reasonableness and Necessity**

To avoid condemnation as an unconstitutional impairment of contract, a state law with a legitimate public purpose must also be reasonable and necessary.  *See Buffalo Teachers*, 464 F.3d at

---

[33] *See* Governor's July 17, 2020 Proclamation, at 2–3, *available at* https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200717-Call-of-July-2020-Special-Session.pdf (last visited August 27, 2020); D.'s Opp. Br. at 3 (internal quotation marks omitted).

[34] D.'s Opp. Br. at 15.

369.   Courts "usually defer to a legislature's determination as to whether a particular law was reasonable and necessary."  *Id.* at 369; *see CFCU Cmty. Credit Union*, 552 F.3d at 266.  However, when the state is a party to the impaired contract, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the [s]tate's self-interest is at stake." *Buffalo Teachers*, 464 F.3d at 369 (internal quotation marks omitted); *see Sullivan*, 959 F.3d at 66 ("when the state impairs a public contract the presumption that a passed law is valid and done in the public interest does not immediately apply").   Judge Calabresi's opinion in *Sullivan* sums up the point:

> The key to all this—we repeat—is to determine whether the state in breaching a contract is acting like a private party who reneges to get out of a bad deal, or is governing, which justifies its impairing the plaintiffs' contracts in the public interest. It was with this in mind that in *Buffalo Teachers* we developed and applied a "less deference" standard.

959 F.3d at 65.  *Sullivan* then expanded on the procedure to be followed:

> Under the *Buffalo Teachers* "less deference" standard, we look first to whether the contract impaired is public or private. If—like the one before us—it is public, we ask whether there is "some indicia" that the state impaired the contract out of its own self-interest. If so, then "less deference" scrutiny applies and it must be shown that the state did not (1) consider impairing the contracts on par with other policy alternatives or (2) impose a drastic impairment when an evident and more moderate course would serve its purpose equally well, nor (3) act unreasonably in light of the surrounding circumstances. These factors amount to a requirement that the state acted both reasonably and out of necessity.

959 F.3d at 65–66 (citations, internal quotation marks and ellipses omitted).

In such a case, the court must examine the record for "evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct." *Buffalo Teachers*, 464 F.3d at 365; *see Sullivan*, 959 F.3d at 66.

A plaintiff bears the burden of proof on this aspect of a Contracts Clause claim. "On this issue,

plaintiffs have the burden of proof because the record of what and why the state has acted is laid out in committee hearings, public reports, and legislation, making what motivated the state not difficult to discern." *Buffalo Teachers*, 464 F.3d at 365; *see also Sullivan*, 959 F.3d at 66 (the burden of putting forth sufficient evidence to show that the state law was "self-serving" "lies with the plaintiffs").

The cases illustrate the application of the principles articulated in *Buffalo Teachers* and *Sullivan.* To meet its burden, a plaintiff must show that the state is "reneging on its obligations" and "altering the contract for its own benefit." *Sullivan*, 959 F.3d at 66. A state engages in reneging when it impairs a contract to benefit "financially, or as a matter of political expediency." *Sullivan*, 959 F.3d at 66. For example, a state engages in reneging if "contractual impairment was chosen when other politically unpopular alternatives were available." *Id.*

"[I]ndicia of reneging may be shown through evidence that the contractual impairment is a response to a well-known, long-standing, problem, as opposed to a change in circumstances." *Id.* at 67; *see U.S. Trust Co.*, 431 U.S. at 31–32 (holding a contractual impairment unreasonable in part because for "over a half century" "the need for mass transportation in the New York metropolitan area was not a new development, and the likelihood that publicly owned commuter railroads would produce substantial deficits was well known").

Finally, a plaintiff might show that "the law took aim at a narrow class of individuals when its purported goals could be served equally by spreading the necessary sacrifice throughout a broader, and perhaps more politically powerful, base." *Sullivan*, 959 F.3d at 66.

If a plaintiff "has put forward some evidence tending to show that the government has engaged in reneging instead of genuinely acting for the public good," "less deference scrutiny applies." *Id.* (internal quotation marks omitted); *see Buffalo Teachers*, 464 F.3d at 370 ("assuming the state's

legislation was self-serving to the state, we are less deferential to the state's assessment of reasonableness and necessity ...").

The CSPU argues that "less deference" scrutiny should apply because, by adopting the Act's disclosure provisions, Connecticut reneged on its obligations and altered the bargaining agreement for its own benefit.[35]  The CSPU argues that Connecticut enacted Sections 8 and 9 of the Act in order to circumvent a recent decision issued by Connecticut Office of Labor Relations, which sustained the CSPU's grievance against the DESPP.  In the grievance, the CSPU complained that the DESPP sought consent from State Troopers to release investigations with a disposition of "Exonerated, Unfounded, or Not Sustained"—investigations that are expressly exempt from disclosure under Section 9 of the 2018–2022 Collective Bargaining Agreement.  On June 10, 2020, the Connecticut Office of Labor Relations ordered the DESPP to cease and desist from this practice.[36]  The CSPU insists that the "sole purpose" of Sections 8 and 9 of the Act was to allow the State to circumvent Section 9 of the 2018–2022 Collective Bargaining Agreement prior to its expiration on July 30, 2022, so that the State could renege on its obligations.  The CSPU also contends: "There have been *no* changed or unforeseen circumstances since the CBA was approved by the General Assembly last year."[37]

The CSPU's several contentions fail to address the Commissioner's argument that "less deference" scrutiny should not apply because, in its actions, the State was motivated by the public

---

[35]  CSPU's Reply at 6–7.

[36]  *See* CSPU's App., Ex. 6, Step 2 Decision on CSPU's Institutional Grievance, OLR No. 05-3258 (June 10, 2020).

[37]  CSPU's Reply at 7.

interest, not self-interest.[38]  The Commissioner argues that the State sought to subject disciplinary records to FOIA for the public benefit, as part of its comprehensive effort to enhance transparency and accountability in law enforcement.  The Commissioner explains that the need for law enforcement reform became more apparent following the mass protests and demands for enhanced accountability that were prompted by a police officer's killing of George Floyd on May 25, 2020—an event that constituted a change of circumstances that justified impairing the State's agreement with the CSPU.[39]

The killing of George Floyd occurred in Wisconsin, but the immediate and furious public response was near nation-wide.  The Commissioner expresses the view that, by subjecting police disciplinary records to FOIA, Sections 8 and 9 of the Act ensure greater police accountability and benefit the public, "who can now access these important records and see for themselves how state government is operating in this area."[40]  That enhanced  public accessibility, the Commissioner contends, brings these provisions into alignment with FOIA's legislative objectives.  *See Dep't of Pub. Safety, Div. of State Police v. Freedom of Info. Comm'n*, 242 Conn. 79, 89 (1997) ("because of the public interest in the fairness of police investigations, there  is a general presumption in favor of disclosure, even for investigative reports that exonerate police officers from the charges that have been brought against them.").

The CSPU does not squarely address these arguments, instead offering only the conclusory assertion that Sections 8 and 9 have no legitimate public purpose.  The CSPU does not suggest any

_____

[38] D.'s Opp. Br. at 3, 15–16.

[39] *See id*. at 3, 12, 16, 18.

[40] *Id*. at 15.

other "politically unpopular alternatives" that the State could have pursued to advance its objectives regarding promoting transparency in the operation of law enforcement.

In similar fashion, the CSPU also does not respond to the Commissioner's argument that the less deference scrutiny is inappropriate because Sections 8 and 9 of the Act apply broadly to all of the State's collective bargaining agreements, both past, present and future, not just its agreement with the CSPU on behalf of the NP-1 bargaining unit, which is at issue in this case.[41]  For example, Section 8 of the Act provides: "For any agreement ... approved before, on or after the effective date of this section ... on matters appropriate to collective bargaining ... where any provision in such agreement ... pertaining to the disclosure of disciplinary matters or alleged misconduct would prevent the disclosure of documents required to be disclosed under the provisions of the Freedom of Information Act ... the provisions of the Freedom of Information Act shall prevail."

On the present record, the CSPU offers no evidence that the Act's disclosure provisions target only the 2018–2022 Collective Bargaining Agreement.  *Cf. Allied Structural Steel Co.*, 438 U.S. at 250 (noting that the change to pension plans in that case "was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees"); *Assoc. of Surrogates & Supreme Court Reporters within City of New York v. State of New York*, 940 F.2d 766, 773 (2d Cir. 1991) ("[B]y placing the costs of improvements to the court system on the few shoulders of judiciary employees instead of the many shoulders of the citizens of the state, they ruffle only a few feathers and fight the 'exploding drug crisis' without raising taxes or cutting other

---

[41] *See id.* at 15.

governmental programs."). In other words, the CSPU "[does not] identify a broader class of individuals whose similar disciplinary records are not subject to disclosure" in light of the new legislation.[42]

Nor can it be plausibly argued that Sections 8 and 9 confer any financial benefit on the State. *Cf. Sullivan*, 959 F.3d at 67 (analyzing the state-imposed wage freeze under less deference scrutiny, partly because the wage freeze potentially benefitted the state financially); *U.S. Tr. Co. of New York*, 431 U.S. at 26 ("If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.").

While the CSPU argues that the State could have waited until the expiration of the 2018–2022 Collective Bargaining Agreement before categorically subjecting disciplinary records to FOIA, "the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 17 (1977).

For these reasons, the CSPU has not met its burden of showing that less deference scrutiny must apply to the State's legislation. Even assuming, however, that the CSPU has produced evidence sufficient to trigger the application of "less deference" scrutiny, Sections 8 and 9 must still be upheld if "'the state did not (1) 'consider impairing the ... contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances.'" *See Sullivan*, 959

---

[42] D.'s Opp. Br. at 16.

F.3d at 65.[43]

The CSPU maintains that the State's impairment of the 2018–2022 Collective Bargaining Agreement before its expiration was neither reasonable nor necessary. The CSPU states that the non-disclosure provision of the Section 9 of the 2018–2022 Collective Bargaining Agreement was adopted in response to concerns regarding an increase in false anonymous complaints filed against Troopers.[44] The CSPU argues that subjecting complaints with a disposition of "unfounded" or "not sustained" to disclosure under FOIA would lead to publication of such false complaints. Thus, the CSPU argues that "disclos[ing] for publication anonymous and false complaints made against police officers" is an unnecessary, drastic measure that would not advance FOIA's goals, but would only unnecessarily tarnish State Troopers' reputation.[45]

Although the CSPU contends that the Act's disclosure provisions are unreasonable because they would invade the privacy rights of state troopers and tarnish Troopers' reputation when false, unsustained allegations are disclosed,[46] the State's decision to make disciplinary records subject to FOIA neither negates State Troopers' personal privacy rights, nor implies that all such records will be disclosed.

---

[43] While it is the plaintiff's burden to show that "less deference" scrutiny should apply in the first instance, the Second Circuit has declined to "take [a] position on whether the plaintiffs or the government bears the burden of proving the reasonableness and necessity of the government's contract-impairing actions" under "less deference" scrutiny. *Sullivan*, 959 F.3d at 66. However, on motion for a preliminary injunction, it is the CSPU's burden to demonstrate a likelihood of success on the merits. *Deutsche Bank*, 943 F.3d at 635; *Kelly*, 933 F.3d at 184.

[44] CSPU's Reply at 4; CSPU's App. at 5.

[45] CSPU's Reply at 7.

[46] *Id.*; CSPU's Br. at 14.

Under FOIA, State Troopers' privacy interests must be balanced with "the public interest in the fairness of police investigations." *See Dep't of Pub. Safety, Div. of State Police*, 242 Conn. at 89. "[B]ecause of the public interest in the fairness of police investigations, there is a general presumption in favor of disclosure, even for investigative reports that exonerate police officers from the charges that have been brought against them." *Id.* at 88.

At the same time, however, "[n]othing in the Freedom of Information Act shall be construed to require disclosure of ... Personnel or ... similar files the disclosure of which would constitute an invasion of personal privacy." Conn. Gen. Stat. § 1-210 (b)(2); *see Perkins*, 228 Conn. at 175 (explaining that "the invasion of personal privacy exception" precludes disclosure under FOIA "when the information sought by a request does not pertain to legitimate matters of public concern and is highly offensive to a reasonable person"). In accordance with that reasoning, the Connecticut Supreme Court noted that, despite "a general presumption in favor of disclosure, even for investigative reports that exonerate police officers from the charges," a case-by-case evaluation as to each report was appropriate when a report's disclosure was challenged under FOIA's personal privacy exemption. *See Dep't of Pub. Safety, Div. of State Police*, 242 Conn. at 88 (endorsing the trial court's holding that "disclosure of exculpatory investigative reports should be decided, not categorically, but on a case-by-case basis"). The CSPU has not demonstrated that the Act is unreasonable in its general subjection of disciplinary records with a disposition of "unfounded" or "not sustained" to FOIA's requirements.

Furthermore, the CSPU offers no evidence that Connecticut considered impairing the 2018–2022 Collective Bargaining Agreement on par with other policy alternatives, or that a more moderate course would serve the State's purpose of promoting transparency equally well. The CSPU

states in conclusory terms: "A state is not free to impose a drastic impairment when an evident and more moderate course would answer its concerns equally well."[47] However, the CSPU fails to suggest an alternative course that Connecticut could have pursued to advance its objectives regarding promoting transparency in the operation of law enforcement. Moreover, because State Troopers' disciplinary records were subject to FOIA prior to 2018, a state law subjecting these records to disclosure is hardly unreasonable—particularly in light of the public's recent demands for increased law enforcement transparency and accountability.

On the present record, the CSPU has failed to show it is likely to establish that the challenged provisions in the Act were not reasonable or necessary to achieve the state's legitimate public purpose. Accordingly, the CSPU has failed to establish that it is likely to succeed on its Contracts Clause claim.

IX

Because the CSPU is unlikely to succeed on its Contracts Clause claim, the Court need not decide whether the CSPU has established irreparable harm. *See, e.g.*, *Two Locks, Inc. v. Kellogg Sales Co.*, 68 F. Supp. 3d 317, 333–34 (E.D.N.Y. 2014) ("The Court finds that the Plaintiff has failed to establish a likelihood of success, or a substantial question, as to the merits of its contractual claims. Therefore, the Court need not reach the Plaintiff's arguments with respect to the balance of equities or irreparable harm."); *Wright v. Giuliani*, No. 99 CIV. 10091(WHP), 2000 WL 777940, at *10 (S.D.N.Y. June 14, 2000) *aff'd*, 230 F.3d 543 (2d Cir. 2000) ( "Because plaintiffs have failed to show a clear or substantial likelihood of success on the merits, this Court need not reach whether they have established irreparable harm.").

---

[47] CSPU's Br. at 13.

X

**Balance of Equities and Public Interest[48]**

Similarly, because the CSPU is unlikely to succeed on the merits, the Court need not decide whether the balance of equities tips in the CSPU's favor and whether an injunction would be in the public interest. *See, e.g.*, *Greenlight Capital, L.P. v. Apple, Inc.*, No. 13 CIV. 900(RJS), 2013 WL 646547, at *13 (S.D.N.Y. Feb. 22, 2013) (declining to reach the questions of irreparable harm, balance of equities, and public interest, where the plaintiff failed to show a likelihood of success on the merits); *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2007 WL 3254421, at *9 (S.D.N.Y. Nov. 2, 2007) *aff'd*, 270 Fed. Appx. 56 (2d Cir. 2008) ("Because [the plaintiff] has failed to demonstrate a likelihood of success on the merits or a sufficiently serious question going to the merits, I need not reach the issues of whether the [the defendant]'s fine ... constitutes irreparable injury or whether the balance of hardships tips decidedly toward the team.").

Nevertheless, the Court concludes that enjoining Sections 8 and 9 of the Act would not serve the public interest, and that the balance of equities does not tip in favor of the CSPU. These provisions, which promote disclosure under FOIA, were adopted in response to the public's demand for police reform, and align with FOIA's legislative policy in favor of disclosure of governmental records. Enjoining Sections 8 and 9 of the Act would circumvent the state's salutary efforts to enhance transparency and promote accountability in law enforcement. *See Wilson*, 181 Conn. at 328; *City of Stamford*, 241 Conn. at 313; *Rose*, 221 Conn. at 233.

---

[48] "Where, as here, the government is a party to the suit, the[se] final two factors merge." *New York v. United States Dep't of Homeland Sec.*, No. 19-3591, 2020 WL 4457951, at *8 (2d Cir. Aug. 4, 2020).

XI

One may readily sympathize with the distress of Connecticut State Police officers, whose Union has sued Commissioner Rovella for injunctive relief.   The Union had obtained,  through collective bargaining,  an agreement that shielded from public disclosure under the Connecticut FOIA internal investigations of officers disposed of as "Exonerated, Unfounded or Not Sustained."   Officers falling within that category may reasonably regard themselves as administratively exonerated from charges of wrongdoing.  Officers may also consider exempting such investigative records from FOIA disclosure as necessary to protect personal privacy and avoid harassment.  These are legitimate concerns, during a time of heightened public awareness and outrage.  The Collective Bargaining Agreement protected those concerns.  The Connecticut Legislature then passed the Act, which destroys that protection.

The CSPU's response was to claim in this Court that the Act's impairment of the agreement violates the Contracts Clause of the Constitution. That response is predictable, and, given the workings of human nature, eminently understandable.   The difficulty confronting the Union and its constituent state police officers lies in the nature of the Act.  The Connecticut Legislature passed the statute in question, captioned "an Act Concerning Police Accountability," in order to address what Governor Lamont in his Proclamation identified as "recent events and the justifiable anger over them" which evoked Dr. King's "fierce urgency of now." In doing so, the Legislature exercised its power to "govern in the public interest," which the Second Circuit said in *Sullivan* "the state may not contract away." 959 F.3d at 63.   The question posed by the case at bar is whether this Act, passed for that purpose, violates the Contracts Clause of the Constitution.

First in *Buffalo Teachers* and then in *Sullivan*, the Second Circuit held after full discovery and on motions for summary judgment that legislative acts freezing public servants' contracted-for wages

31

did not violate the Contracts Clause.  The acts were triggered by community fiscal crises.  It is hard to imagine contractual rights more important to employees than their wages.  The Second Circuit rejected their constitutional claims.  Judge Calabresi's opinion in *Sullivan* stated that the county's actions "in imposing the 2011 wage freeze were both reasonable and necessary and comfortably meet the standard of 'less deference' scrutiny." 959 F.3d at 69.  *Sullivan* concludes:

> [W]e emphasize that whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned.  Our job is simply to determine whether the wage freeze was imposed in order to renege on a contract (to get out of a bad deal) or as a governmental action intended to serve the public good, as the government saw it.

*Id*. (citations and internal quotation marks omitted).  The Second Circuit held that the wage freeze fell within the latter category, and affirmed summary judgment for the county dismissing the plaintiffs' Contract Clause claims.

Unlike *Buffalo Teachers* and *Sullivan*, the case at bar does not present the question on a full evidentiary record and motions for summary judgment.  Rather, the question arises on Plaintiff CPSU's motion for a preliminary injunction.  Therefore, under Rule 56(a) practice the decisive question is whether the CSPU has shown the likelihood that its Contracts Clause claim will succeed, where that claim by the plaintiffs in *Buffalo Teachers* and *Sullivan* failed.

## XII

## Conclusion

For the reasons stated in this Ruling, I am unable to hold that the CPSU has made that showing.  Accordingly, Plaintiff CPSU's Motion for a Preliminary Injunction [Doc 4] is DENIED.

It is SO ORDERED.

Dated:        October 13, 2020

              New Haven, CT

                                              /s/ Charles S. Haight, Jr.
                                          CHARLES S. HAIGHT, JR              .
                                          SENIOR DISTRICT COURT JUDGE